We'll hear the next case, United States v. Bergstein. May it please the Court, my name is Alexandra Shapiro and I represent appellant David Bergstein. Mr. Bergstein was denied a fair trial. There were principally based on two points that I want to focus on, we've made others in the brief, but first, vast quantities of unfairly prejudicial 404B evidence that was irrelevant to the charges and highly inflammatory, and in addition he was prevented access to critical defense evidence when the District Court quashed Rule 17C subpoenas under an unduly harsh standard. First, the 404B evidence admitted in this trial was extensive and covered four distinct topics. It was classic propensity evidence. There was tax evidence that consisted of improper expert testimony masquerading as lay testimony by an IRS agent. There was evidence about gambling that had nothing to do with the charges and occurred in numerous years earlier, and gambling debts in large amounts. There were two businessmen who had gripes with Mr. Bergstein based on numerous and testimony was elicited based on numerous transactions that they engaged in with him that had nothing to do with the charges, which occurred much later. And the gambling evidence in particular was kind of a bootstrap-y argument by the government, and as they continue to argue on appeal, they claim that the gambling evidence was relevant to establishing Mr. Bergstein's motive for the deals that are at issue in connection with the charges, when in fact there's absolutely no evidence that any of them were repaid by any of the proceeds from the transactions that were charged. And in fact, the government argues that he needed the money from these two guys, Swartz and Stevens, to repay these gambling debts, but the transactions that the 404B evidence related to had occurred well before, so even if it was true that those transactions weren't there. Mr. Shapiro, they were trying to show, I think, the motive, why he needed to divert the money in the charges here, that he had diverted their money for gambling in part and was trying to, and in fact, in at least one instance, utilized T.T. proceeds, $1 million of the loan to purchase Stevens' claim against him. So that was their primary argument. Well, Your Honor, we're not disputing that that little piece of testimony was relevant. We agree that the government was using the money. But you said a moment ago that there's no evidence that any of the money that he took from them, that they tried to use the money in this case to repay it back, but there is at least that one instance, right? Well, Your Honor, just to be clear, what I was saying was that the gambling that the gambling has nothing to do with this case. Well, it does, to the extent they have to show that he diverted money in that prior instance for gambling, which was inappropriate, and then, in order to avoid that being uncovered, paid them, he diverted money again to pay them back. Well, no, that's not what happened, Your Honor, with due respect. There's one tiny piece of all of this testimony that actually relates all of the 404B that we're not challenging, which is the $1 million that Your Honor mentioned. However, the other, all the other deals occurred long before, and the gambling occurred long before, and there's no evidence whatsoever that any money was used to repay gambling that came from the transactions at issue in the charges. The point is that their argument is that he still owed them the money. He still owed them the money from these, even though they were won over, the money had never been paid, and he needed to pay them. That's their argument. But that's not, that's not, the evidence doesn't show that any money was diverted other than that $1 million, and yet the district court allowed them to testify about numerous transactions. For example, Mr. Stevens, there were five other transactions involving $8 million that he was allowed to testify about. The gambling, and Mr. Swartz, you know, there was absolutely no basis. There was no money that was, that was diverted. So all of this was just, and quite frankly, I think. Roberts, you talk about the $80,000, I guess you say, was not T.T. Well, that was not argued below. The government never argued that below, and we don't think the evidence supports it. And if you look at the entirety of this, why did the government need to go so far afield from the charges? It's very easy to get the jury inflamed about gambling debts and $1 million of casino gambling, when these were complex transactions and the government relied heavily on the two cooperators and a lot of the testimony, the worst testimony was uncorroborated by any documents. And so, and with respect to the tax testimony, we have a number of things. The IRS agent who told the jury that he was an expert on money laundering and criminal tax investigations, and he testified, for example, that two of the relevant entities had failed to file tax returns between 2009 and 2016, and that the tax code didn't require that, even though he was never permitted to, supposed to be permitted to testify as an expert. If I may, I'd like to just go into that issue. Again, the basic point there was that if the defense was this was legitimate compensation, isn't the government then permitted, when that's the defense, to show that it wasn't reported on his tax returns or any of the, you know, entities that they say were under his control? Well, Your Honor, the problem here is that they introduced lay testimony — sorry, expert testimony in the guise of lay testimony. Not only did they not give expert notice, they disclaimed — I read the testimony. They introduced the tax returns themselves, which showed only $2 million in income, far less than what was involved here. And then on the other entities, they just showed the lack of any — there was no opinion. It was just, did this company file a tax return these years? So I'm not sure what the opinion was. There were numerous opinions, but most particularly, I would direct Your Honor to pages 420 and 421 of the appendix. And if you look there, you'll see that the agent testified not only that the Graybox entity failed to file, but that it was supposedly required to file a tax return, which itself is controversial and, indeed, it's contradicted by information on the IRS website. And Mr. Bergstein wasn't allowed to introduce his own rebuttal. In addition, on page 421 of the appendix, he also gives similar testimony about Swartz IP, and both of those were over specific objections. If I may, I want to turn briefly to the Rule 17c issue, because I think this is a very important issue, and this circuit has never squarely addressed what is the proper standard for defense subpoenas to third parties as opposed to the government. As the Court is aware, numerous district courts have, as Judge Kaplan put it, mindlessly applied the Nixon standard, despite the fact that that case was very different. And I respectfully submit that this Court's guidance is needed.  We have as well, right? We have as well, perhaps mindlessly, but in summary orders and the other. Well, Your Honor, there are some summary orders, but this Court has no precedential opinions, and I think, first of all, that Nixon. And your argument is that Ulbricht is distinguishable because it was a subpoena served on the government? Yes. That's absolutely the issue here, Your Honor. And Nixon expressly reserved in footnote 12 the question of whether a lower standard should apply in the context of third parties, and said it didn't need to reach that question because the standard that it set was met there. Why should the standard be different? The standard should be different for several reasons. First of all, the text of Rule 16 only talks about whether a subpoena is unreasonable or oppressive. And here we don't even have any third party to whom the subpoenas are directed saying that. More importantly, the reasoning behind having a tough standard when it comes to the government is that there could be a conflict with Rule 16 and the government's Rule 16 obligations. Here, we not — first of all, not only is the standard we're urging, the Tucker standard, a materiality standard that's very similar to Rule 16, but more importantly, the existing state of play in the district courts with the majority rule creates an incentive, a perverse incentive, for the government not to seek all the relevant evidence. And that's exactly what happened here. The government deliberately chose to not seek all the e-mails that could have been pertinent. Roberts. How many subpoenas were served? I'm sorry, Your Honor? How many subpoenas were served on third parties? Like 50 or something like that? We're not arguing that as to all of them. We're — we focus — But if there are 50 subpoenas served, it does sound like a phishing expedition. Well, Your Honor, I would urge the Court to look at the specific subpoenas that are most directly relevant here, and those are the ones we focus in our brief, and I can give a couple of examples. But I think the point here is that if the Nixon standard is applied, it's virtually impossible for a defendant to meet. A defendant cannot show specifically what documents are in the — in the possession of the third party, except in a rare case. It's not like the government, where, for example, in the Nixon case, the government knew what was probably on the President's tapes because it had witnesses who had participated in the conversations. The defendants are not — do not have the access to that kind of information to be able to know specifically what documents are in the possession of third parties. You're out of time. You have some time for rebuttal. Thank you, Your Honor. We'll hear from the government. Good morning. May it please the Court, Edward Imperatore for the government, I represented the government below in the District Court, and I do so in this Court on appeal. The judgment of the District Court should be affirmed in all respects. Judge Castell properly exercised his discretion in various evidentiary rulings, including allowing the government to admit the defendant's tax returns during the period of the conspiracy, concluding that the defendant opened the door to cross-examination about his failure to pay taxes, and admitting evidence of the defendant's prior relationship with Swartz and Stevens and his misappropriation of their investments. In addition, the Securities and Investment Advisor conviction should be affirmed because the evidence was sufficient and the Investment Advisor theories were valid. Let me begin with the arguments the defendant has advanced about Jerry Swartz and Stevens. Judge Castell properly exercised his discretion in allowing evidence of David Bergstein's prior business dealings with those two individuals to be introduced, first, as direct evidence, and second, in the alternative pursuant to Rule 404B. There are a number of independent bases for his discretion. Let me begin with the Swartz evidence. Evidence of David Bergstein's prior business dealings with Jerry Swartz and his misappropriation of Swartz's money, and he did so by using his prior investment proceeds to pay gambling debts, goes directly to a central issue in the case, which was whether Jerry Swartz backed Swartz IP, which was the entity that received Weston money, and whether he had infused capital into that entity. A central misrepresentation that Bergstein told Weston was, Jerry Swartz, this wealthy investor, is my business partner in Swartz IP, and he has backed Swartz IP with $19 million of money. That was false. The fact that Swartz had invested and lost millions of dollars with Bergstein previously demonstrated that when Bergstein had, excuse me, when Swartz had entrusted money to Bergstein, it wasn't for Swartz IP. It was for some prior investment. It helped explain why Swartz was not a part of Swartz IP. And it also explains that Swartz IP never actually had millions of dollars of Swartz's money. It corroborates Swartz's testimony on that point, and I would note that the defendant's reply brief really attacks Swartz's credibility, and that underscores why this evidence of this prior misappropriation was admissible. There are other reasons as well, as Judge Bianco's questions indicated, there's motive here. The evidence at trial demonstrated that Bergstein committed the Weston fraud in order to repay all debts. He misappropriated money from Swartz and Stevens in order to pay his own gambling debts, and then he lied to Weston to get money to repay Swartz and Stevens. So he's using money in a Ponzi-like fashion to cover up the prior misappropriation. Either of these two bases is an independent basis for introduction of the evidence. And I would just note on this point- Roberts, the IRS agent, he does seem to give opinion evidence as to whether, for example, the tax return was required. I mean, why is that not expert testimony? Judge Chin, we disagree that he opined or reached an opinion about what was required. What he did was he admitted two types of evidence. One is he authenticated the tax returns themselves, and he authenticated what are called- But on page 421, he's asked, what kind of tax return was Swartz IP supposed to file? And he gave an answer. I'm sorry. So that's based on documentary evidence. On Swartz IP, two pieces of documentary evidence establish that point. First, the government introduced an exhibit. I believe it's a government exhibit 306, which is an email that was sent to David Bergstein in which that attached a notification from the IRS that was sent to Bergstein's office directed to Swartz IP. And the notification itself said, Swartz IP is required to file a form 1120. That was offered pursuant to a stipulation. Bergstein- What about Grayson, though? You heard the argument that with respect to Grayson, that it's controversial whether or not they had to file anything or not, and that they were not permitted to even rebut that piece of testimony. Well, we disagree, Judge Bianco. And the reason is, again, on both Swartz IP and Graybox, all the witness testified was what was reflected on the certification of lack of record, which is that these entities did not file tax returns. And with respect to Swartz IP, there was an independent document that established that it was required to file that return. What the agent was simply doing was stating what was reflected on the plain text of the document. With respect to the issue of whether he was allowed to rebut it, this is a misleading argument here. The defendant never actually tendered an expert witness. That didn't happen. We would draw the court's attention to pages 1378 and 1379 of the transcript, and we have copies for the court. What defense counsel actually said on page 1379 was, if we do it at all, it's a rebuttal expert. That's on page 1379. So he was not precluded from responding, but I think the salient point here is that there was no opinion to respond to. All the IRS witness was doing was authenticating records. That was proper under the Second Circuit's precedent under cases like Valenky and Osenkaro to demonstrate that the returns did not contain the proceeds of the scheme. He did not reach any opinion. He did not accuse the defendant of wrongdoing. Why don't you move to the subpoena issue? Yes, Your Honor. So on the issue of the Rule 17 subpoenas, this argument is without merit. What the defendant is urging the court is to adopt a standard articulated by Judge Shinlen in the Tucker case. The government is not aware of any court in this circuit or outside of this circuit ever applying that standard other than Judge Shinlen. And it does not apply here for a variety of reasons. First, as Nixon and Bowman-Derry hold, a subpoena is not intended to provide a means of discovery in criminal cases. That holding applies equally to both defendants and the government. There's no basis under the rule or under Nixon or Bowman-Derry to draw some artificial distinction between what a defendant can do and what the government can do under Rule 17. The bottom line is the defendant's tools for obtaining discovery are Rule 16. And in any event, this court has repeatedly applied Nixon, albeit in summary orders, quashing defense subpoenas to third parties in criminal cases. That happened in multiple cases, including both Cudi and Conway. And in any event, the defendant can't even satisfy the standard that he himself asked the court to adopt here, which is the Tucker standard, for two independent reasons. One is under Tucker, it was required that he issue this subpoena on the eve of trial, under that standard, he didn't do that. And secondly, he can't even show an articulable suspicion that the records he was looking for contained information material to his defense. And I think the examples he demonstrates highlight that. First of all, he claims that he was entitled to discovery of someone named Paul Parmar, and that somehow discovery of Parmar could highlight Bergstein's good faith intent. That makes no sense here. Paul Parmar was a downstream recipient of Weston money from Bergstein. The money that Bergstein gave to Parmar was purportedly for medical billing. That was outside the scope of the offering memoranda. So therefore, there's no reason to think that somehow discovery of Parmar could shed- They're arguing in part that the government is using the Nixon standard essentially to shield themselves from their discovery obligations. And there was email in the record that they attached where defense counsel and the prosecutor had a back and forth. The defense lawyer said, can I have X, Y, and Z? And the prosecutor said, they're not in our possession. We don't have to produce those to you. So what's your response that this is the government skirting its discovery obligations through Nixon? That's absolutely not the case here, Your Honor. The government produced thousands of emails of both cooperating witnesses that were exchanged over Weston's email servers. The government also made a request, and this is in the record, to Halleck's attorney for relevant emails in Halleck's Gmail account. It produced those emails. It did not make a similar request to Wellner because there was scant evidence that Wellner used his personal email to exchange communications about the scheme. But there's no required, I mean, so certainly the government was not playing tactical games here, that was not the case at all, but in any event, the government was not required to seek discovery from its cooperators, it did in the case of Halleck, but certainly there was no game playing here, and there's also no prejudice to the defense either. The defense can't articulate any evidence that it claims it was entitled to, that it didn't receive under its standard, and its own arguments tend to highlight the absence of any such argument. I have a minor housekeeping thing. With regard to the calculation of the forfeiture amount, there were some payments that went directly to third parties that encompassed about three point some odd billion dollars, and there was an assertion that those shouldn't have been calculated by the defendant. And I didn't see a response from you in that regard. Do you disagree that those should have been, not have been subject to the forfeiture order, because Bernstein never exerted control over that in that sense? No, we disagree. Bergstein was properly subjected to paying forfeiture for proceeds that he controlled and then dispersed to third parties. I think it's important to keep in mind the flow of funds here. The defendant sought loans from third parties, excuse me, from Weston. He used shell companies that he controlled to- These were transfers directly from the P2 fund directly to three entities. One of them, Melvin and Myers, and then two other entities. But in this case, under Contarinas, Bergstein did control those proceeds, because the loan was issued ostensibly to Arius Libra, which is a shell company that he controlled. Bergstein selected the amounts of the proceeds and selected the recipients. And so under Contarinas, he did control those proceeds. And that's also consistent with Section 853P, which holds the defendant responsible for substitute after-profit proceeds that he's dispersed. I see I'm out of time. The government submits that the judgment should be affirmed in all respects. Thank you. We'll hear the rebuttal. Thank you, Your Honor. Just three points. First of all, with respect to the tax expert, it's absolutely the case that Mr. Bergstein's attorney specifically asked to be able to call someone to rebut the IRS agent if the agent was going to be allowed to give these opinions. If you look at the appendix 386, trial transcript page 1378, defense counsel specifically says that they're going to need to call a tax person to basically say, in these situations, this is what you would and wouldn't have to report, that's what it would be. The court, well, you do have the issue of the expert deadline having passed, and the colloquy continues. And defense counsel again says, we didn't know we were getting experts, they didn't designate a tax expert, we weren't looking to do a tax case, all we would be doing is a rebuttal expert. And then the court says to the government, well, is your IRS guy going on as an expert, Mr. Imperator? And government counsel says, no, he's not, Your Honor. So that request to rebut was certainly preserved. There was also a passage in there where the defense lawyer said, I'll check on that when there's discussion of the timing. It was left open with the defense lawyer saying, I'll check on that when Judge Costell raised the timing. And then the topic changed, and it was never raised again before or after the agent's- I think that occurred before the passage I was just reading. But regardless, I think- There's no ruling where Judge Costell said, I'm not allowing any rebuttal expert. It was discussed, there was an issue of timing, and then- I don't think that's fair- When the agent was done, the defense lawyer didn't say, Your Honor, in light of what the agent has said, I want to revisit this issue of calling an expert. There was no- Well, with all due respect, Your Honor, I think there's a question, there's a point at which it becomes futile. And the judge had made his opinion clear, and defense counsel had previously raised the issue, and we don't think it, you know, he had to keep raising it. It was clear. The court had ruled. With respect to Nixon, the government talks about Bowman-Derry. Bowman-Derry involved a government subpoena, and in Nixon, as I mentioned earlier, footnote 12 expressly reserves the question of whether a different standard should apply with respect to third parties. The test, the Nixon test itself, is not based on the plain language of the rule. Nixon was decided in the 1970s. As the Supreme Court mentioned in one case last term, statutory interpretation has changed quite a bit, and it's much more based on the text today. It's simply not fair to have a standard that's significantly lower in a civil case as to third parties than in a criminal case when a defendant's liberty is at stake. And with respect to the importance of the material, I'll just, you know, mention a couple of examples. One of the things that was sought was the fund prospectuses, and the government claimed that the funds were only supposed to be used for certain purposes, and the defendant was never able to get copies of the entire prospectus to test that. There was also, with respect to the T.T. transaction, there had been earlier efforts by Weston to engage in a similar transaction called the core transaction. There was evidence suggesting that there were opinions of counsel indicating it would be permitted. It was a very similar transaction. That could have shown that, in fact, this type of transaction would have been a permitted use of the funds. So those are just a couple of examples. We have others in our brief. And then lastly, I see my time is up, but I do want to may I make one additional point with respect to Judge Wesley's questions about the forfeiture. First of all, as to the P-2 transfers, we gave a couple of examples in our brief, but in fact there are other examples. And the total amount of $5.3 million was disbursed directly to third parties and not through any entity that Mr. Bergstein controlled. Roberts, I mean, was that done? It may have gone to third parties, but was that done at his direction? There's no evidence suggesting that those particular transfers. For example, there's $900,000 to a Wimbledon fund. There's another $700,000 to Weston Capital Asset Managements. There are three transfers to an entity called General Health Technologies, Sage Group Consulting. There are several transfers to Jerova, the O'Melveny and Myers transactions we mentioned in the brief. And all of this is at pages 487 through 489 of the appendix in a chart that the government's expert put in. With respect to the TT fund, those payments all did go through Swartz IP, but there's another $5.96 million. And the last point, if I may, I do want to emphasize that the contrariness, we don't believe, survives the Supreme Court's decision in Honeycutt. And at a bare minimum, the $5.3 million, the forfeiture order should be reduced by the $5.3 million in transfers directly from the P-2 fund to those other third parties. But we believe also the additional $5.9 million that went in connection with the TT transaction to third parties should also be reduced. Thank you. Thank you, Your Honor. We'll reserve decision.